# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Oji Konata Markham
        Plaintiff,       Case No. 22-cv-187 SRN/BRT

V.

Officer A. Tolbert 209      Demand For Jury Trial
Officer B. Miller 251      (YES)
Officer C. Glirbas 104
Officer          193
Officer S. Hilyar
Officer M. Shepard 2215
Officer Denise Urmann 2214
Officer Rawlings
Prosecutor Jennifer S. Bovitz
Prosecutor Dain Olson
Prosecutor Heather D. Pipenhagen
Detective Ryan Olson
Defense Counsel Catherine Turner
Appellate Counsel Sara L. Martin
Judge Richelle M. WAhi
Judge David L. Knutson
Oxana Harris
Diana Kladum
Brooklyn Park Police Department
Mendota Heights Police Department
Dakota County Judicial Center
            Defendant(s)

RECEIVED BY MAIL
JAN 24 2022
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

## Complaint For violation of Civil Rights Under 42 U.S.C. §1983

SCANNED
JAN 24 2022
U.S. DISTRICT COURT MPLS

III. Parties:

A. Oji Kenata Markham
   #211943
   1101 Linden Lane
   Faribault, MN 55021

B. Defendant(s):

1. Officer A. Tolbert 209
   Brooklyn Park Police Officer
   Brooklyn Park Police Department

2. Officer B. Miller 251
   Brooklyn Park Police Officer
   Brooklyn Park Police Department

3. Officer C. Glicbas 104
   Brooklyn Park Police Officer
   Brooklyn Park Police Department

4. Officer            193
   Brooklyn Park Police Officer
   Brooklyn Park Police Department

5. Officer Steve Hilyar
   Mendota Heights Police Officer
   Mendota Heights Police Department

6. Officer Micheal Shepard 2215
   Mendota Heights Police Officer
   Mendota Heights Police Department

7. Officer Denise Urmann 2241
   Mendota Heights Police Officer
   Mendota Heights Police Department

8. Officer Rawlings
   Mendota Heights Police Officer
   Mendota Heights Police Department

9. Prosecutor Jennifer S. Bovitz
   Dakota County Judicial Center Prosecutor
   Hastings, Minnesota 55033

10. Prosecutor Dain Olson
    Dakota County Judicial Center Prosecutor
    1560 Highway 55
    Hastings, Minnesota 5503

11. Prosecutor Heather Dawn Pipenhagen
    Dakota County Judicial Center Prosecutor
    1560 Highway 55
    Hastings, Minnesota 5503

12. Detective Ryan Olson
    Dakota County Judicial Center Detective
    1560 Highway 55
    Hastings, Minnesota 5503

13. Defense Counsel Catherine Turner (0349057)
    Dakota County Judicial Center Public Defender
    1560 Highway 55
    Hastings, Minnesota 5503

14. Appellate Counsel Sara L. Martin (No. 287064)
    Assistant State Public Defender
    Office of the Minnesota Appellate Defender
    540 Fairview Ave. North, Suite 300
    St. Paul, MN 55104

15. Judge Richelle M. Wahi
    Dakota County Judicial Center Judge
    1560 Highway 55
    Hastings, Minnesota 5503

16. Judge David L. Knutson
    Dakota County Judicial Center Judge
    1560 Highway 55
    Hastings, Minnesota 5503

17. Oxana Harris
    Alleged Victim
    567 Hawatha Ave
    Mendota Heights, MN 55118

18. Diana Kladum
    Landlord
    8164 Brandywine Parkway
    Brooklyn Park, Minnesota

19. Brooklyn Park Police Department
    Arresting Officers
    Brooklyn Park, MN

20. Mendota Heights Police Department
    On the scene Officers in Mendota Heights
    Mendota Heights, MN 55118

21. Dakota County Judicial Center
    Booking County w/o warrant.
    1560 Highway 55
    Hastings, Minnesota 55033

Additional Plaintiffs:

Provide each defendant's full name, official position, and place of employment. Attach
additional sheets of paper, if necessary.

B.    Name: See 1-21' page 2-5

Official Position:

Employer's Address:

Additional Defendants:

**NOTE: IF THERE ARE ADDITIONAL PLAINTIFFS OR DEFENDANTS, PLEASE
PROVIDE THEIR NAMES AND ADDRESSES ON A SEPARATE SHEET OF PAPER.
Check here if additional sheets of paper are attached: ☐
Please label the attached sheets of paper as II.A. for Plaintiffs and II.B. for Defendants.**

IV. STATEMENT OF THE CLAIM

Describe in the space provided below the basic facts of your claim. Describe how each
individual defendant is personally involved, including dates, places and specific wrongful acts or
omissions by each defendant. Each factual allegation should be provided in separately lettered
paragraphs, beginning with letter A. Do not make any legal arguments or cite any cases or
statutes.

A.    See A through U.

IV.    Statement of the Claim

A. Defendant Officer A. Tolbert 209, resides or works at Brooklyn Park Police Department, and is employed as a Police officer. This defendant is sued in his: Individual and Official capacity. Defendant Officer A. Tolbert, violated the warrantless entry of the Brooklyn Park home at 8164 Brandywine Parkway to seize Markham was a violation of his Fourth Amendment rights. Standing did exist; there wasn't any exigent circumstances to justify the warrantless entry of the Brooklyn Park home.

Officer A. Tolbert and C. Glirbas 104 made a second attempt to pick up Markham at 8164 Brandywine Parkway, and was unable to make contact with Markham. Approximately about 11:45 am, Diana Joy Kaldum told Officer A. Tolbert, Markham would Arrive home at approximately 4:00 pm. Officer cleared at this time. At approximately 4:40 pm. Officer A. Tolbert advised Markham that he was there on behalf of Mendota Height Police Department and he needed to speak with Markham. Officer Tolbert advise Markham that he was under arrest and to place his hands behind his back. Officer A. Tolbert and his fellow officers made a warrantless arrest inside Markham's Brooklyn Park home approximately 4:48 pm, January 22, 2016, no effort was made to obtain an arrest warrant.

The two main issue on post-conviction concern the legality of Markham's arrest. Was there probable cause? Did circumstances justify a warrantless, nonconsensual entry of the home? Petitioner argue both these questions must be answer no, and therefore, evidence obtained from his arrest mostly important, 911 transcripts and data, the Brooklyn Park arresting officer's original reports,

2

Brooklyn Park "original police report", with recorded testimony from petitioner's landlord Diana Kaldum and victims' statement to the police, should have been suppressed because of the withheld evidence because of the Brady violations. SEE Exhibit 1

B. Defendant Officer B. Miller 251, resides or works at Brooklyn Park Police Department, and is employed as a police officer. This defendant is sued in his: Individual and official capacity. Defendant Officer B. Miller 251, violated the warrantless entry of the Brooklyn Park home at 8164 Brandywine Parkway to seize Markham was a violation of his Fourth Amendment rights. Standing did exist; there wasn't any exigent circumstances to justify the warrantless entry of the Brooklyn Park home. Officer B. Miller 251 was assisting Officer A. Tolbert when he made the warrantless arrest inside Markham's Brooklyn Park home approximately 4:48 pm January 22, 2016, no effort was made to obtain an arrest warrant. SEE Exhibit 1

C. Defendant Officer C. Glirbas 104, resides or works at Brooklyn Park Police Department, and is employed as a police officer. This defendant is sued in his: Individual and official capacity. Defendant Officer C. Glirbas 104, violated the warrantless entry of the Brooklyn Park home at 8164 Brandywine Parkway to seize Markham was a violation of his Fourth Amendment rights. Standing did exist; there wasn't any exigent circumstance to justify the warrantless entry of the Brooklyn Park home. Defendant Officer C. Glirbas 104, was assisting Officer A. Tolbert when they made the warrantless arrest inside Markham's Brooklyn Park home approximately 4:48 pm January 22, 2016, no effort was made to obtain an arrest warrant.

3

D. Defendant Officer Badge #193, resides or works at Brooklyn Park Police Department, and is employed as a police officer. This defendant is sued in his: Individual and Official Capacity. Defendant Officer Badge #193, violated the warrantless entry of the Brooklyn Park home at 8164 Brandywine Parkway to seize Markham was a violation of his Fourth Amendment rights. Standing did exist; there wasn't any exigent circumstance to justify the warrantless entry of the Brooklyn Park home. Defendant Badge #193, was assisting Officer A. Tolbert when they made the warrantless arrest inside Markham's Brooklyn Park home approximately 4:48 pm January 22, 2016, no effort was made to obtain an arrest warrant. SEE Exhibit 1

E. Defendant Officer Steve Hilyar, resides or works at Mendota Height Police Department, and is employed as a Police Officer. This defendant is sued in his: Individual and Official Capacity. Defendant Officer Steve Hilyar, violated by authorizing Brooklyn Park Police Department to make a warrantless entry of the Brooklyn Park home at 8164 Brandywine Parkway to seize Markham was a violation of his Fourth Amendment rights. Standing did exist; there wasn't any exigent circumstance to justify the warrantless entry of the Brooklyn Park home. At 5:00 pm, Officer S. Hilyar (coordinating the arrest efforts from headquarters by radio and telephone) order entry of the Brooklyn Park home of Markham. Markham was transfer to Officer Shepard on I-694 and Rice Street, and was brought to headquarters within an hour. At least by 4:00 pm, then, the Brooklyn Park Police Department had made plans for Markham's arrest at the dwelling where he was staying at such time as Markham might return. Nevertheless, in the hour that elapsed before and arrest could be made at the Brooklyn Park home of Markham, no effort was made

to obtain an arrest warrant to enter the dwelling.
Petitioner does not know if a warrant could have been
obtained within that hour, or within a relatively short time
thereafter; on the other hand, the State has not suggested
the warrant could not have been obtained in trial Court
cross-examining Officer S. Hilyar. Petitioner does not know
a search warrant was obtained on Thursday night or
Friday morning.

Officer Hilyar stated; (Te. 213) (5-8, 15-23) cross-examination:

Q: Where you able to use any of that information?

A: We were. We went through MYBCA, which is a state website
that the police have access to, and I put in the first and last
name, it was -- I believe it was actually my partner,
Denise Urman, we work together as a team, and we were
able to find Oji Markham that lived at that address and also
had a vehicle listed in his name which was an ivory colored
minivan. So at that point we put out a cops' alert to, you
know, try to locate that vehicle.

Q: Okay. Were you able to locate, Mr. Markham at all that night?

A: that night, I was not.

Officer Hilyar never mention on cross-examination that the
Brooklyn Park Police Officers was the ones who made the
Warrantless arrest inside Markham's Brooklyn Park resident on
January 22, 2016 approximately 4:48 pm and who got dispatch to
attempt a p.c. pickup on Markham's 8164 Brandywine Parkway
home the night before the alleged incident January 22, 2016,
Friday night. See Exhibit 1 and 18-19

5.

F. Defendant Officer M. Shepard, resides or works at Mendota Height Police Department, and is employed as a police officer. This defendant is sued in his: Individual and Official capacity. Defendant Officer M. Shepard, violated Markham Constitution by kidnapping him from one county to another county without a warrant. Standing did exist; there wasn't any exigent circumstances to justify the warrantless entry of the Brooklyn Park home.

  Officer Shepard, then instructed Brooklyn Park Department to contact Mendota Height Police Department dispatch and Officer A. Tolbert received a phone call from Officer Shepard. Officer A. Tolbert was advised by Officer Shepard to meet at I-694 and Rice Street. Officer A. Tolbert met with Officer Shepard at the Caribou Coffee at Rice and I-694 and Markham was handed off to Officer Shepard. See Exhibit 1

G. Defendant Officer Denise 2214, resides or works at Mendota Height Police Department, and is employed as a police officer. This defendant is sued in her: Individual and official Capacity. Defendant Officer Denise Urman 2214, violated the warrantless entry of the Brooklyn Park home at 8164 Brandywine Parkway on behalf of Mendota Height Police Department to seize Markham was a violation of his Fourth Amendment rights. Standing did exist; there wasn't any exigent circumstance to justify the warrantless entry of the Brooklyn Park home.

  Defendant Officer Denise Urman 2214, was assisting Officer Steve Hilyar when they went through the MYBCA website, where they seach Oji Merkham name that they said that live at that address. O.H provided also the vehicle listed in Markham's name which was an ivory color minivan. So, at that point Denise Urman and Officer S. Hilyar put a Cops' alert to locate Markham's vehicle which they were unable to locate that night.

H. Defendant Officer Rawlings, resides or works at Mendota Height Police Department, and is employed as a Police Officer of Dakota County. This Defendant is sued in his Individual and Official capacity.

Defendant Officer Rawlings, violated the warrantless entry of the Brooklyn Park home at 8164 Brandywine Parkway on behalf of Mendota Height Police Department to seize Markham was a violation of his Fourth Amendment rights. Standing did exist; there wasn't any exigent circumstance to justify the warrantless entry of the Brookly Park home.

Defendant Officer Rawlings, was assisting Officer Steve Hilyar when they put a cops' alert to locate Markham's vehicle which they were unable to locate that night.

I. Defendant Prosecutor Heather D. Pipenhagen, resides or works at Dakota County Judicial Center, and is employed as a Prosecutor in the Dakota County Judicial Center. This defendant is sued in her: Individual and Official capacity.

Petitioner has consistently asserted that he was unable to present [evidence of perjury by the eyewitness] because of prosecutor's withholding evidence to Petitioner's case.

First, previously undisclosed police records showed that officer Tolbert police report made statements that cast doubt on Officer S. Hilyar credibility. Officer Tolbert report stated, "Officer B. Miller and I then went down to the common area of the basement and waited for him to come out of his bedroom. Once he come out of his bedroom I advised him that he was under arrest and to place his hands behind his back." Which Officer S. Hilyar the Mendota Heights investigator, orchestrated from another jurisdiction without warrant.

Second, contrary to the prosecution's assertions at trial, Officer Hilyar was the investigator officer to testify against

2

Markham, but the state failed to disclose the arresting
Officer, [Tolbert] to Markham trial.
   Third, the prosecution had failed to turn over Brooklyn Park
Police report or Officer Tolbert and subpoena the arresting
Officers. According to Officer Tolbert, office Hilyar orchestrated
the attempt to locate a p.c. pick on Markham's Brooklyn
Park resident. Officer Hilyar Credibility, already impugned
by his many inconsistent Stories, would have been further
diminished had the jury learned about the Brooklyn Park
Police reports and the warrantless arrest inside Markham's
resident, and that prosecutor Dain Olson coached Officer
Hilyar to lie about the 1st degree burglary assault-fear that
took place in Mendota Heights and thereby enhance his
Chances to get out of jail, or that Officer S. Hilyar and Dain
Olson may have implicated Markham to settle a personal score.
Moreover, any juror who found Officer Hilyar more credible in
light of Detective Ryan Olson's testimony might have thought
differently had they learned that Detective Ryan Olson may
have been motivated to come forward by prosecution - as the
prosecution had insisted in its closing arguments - but by the
possibility of a conviction.
   Beyond doubt, the newly revealed Brooklyn Park Police
reports evidence suffices to undermine confidence in Markham's
Conviction. The State's trial evidence resembles a house of cards,
built on the jury crediting Officer S. Hilyar account rather than
Markham's alibi.
   SEE Exhibit 1 And Exhibit 18-19

J. Defendant Prosecutor Jennifer S. Bovitz, reside or works at Dakota County Judicial Center, and is employed as a Prosecutor in the Dakota County Judicial Center. This defendant is sued in her: Individual and Official capacity.

Petitioner argues, even though he was arrested and in custody since January 22, 2016, without a warrant. The district attorney Jennifer S. Bovitz filed a "Motion to Extend 36 hour rule," under Rule 34.02, for good cause to review the police reports, hand stamped January 26, 2015, by Judge and the district attorney. Stating, "she want the matter extended to 1:30 p.m. on January 25, 2016. The right to presentment before a Judge as the defendant begins a potentially extended period of pretrial incarceration" is embodied in the 4th Amendment.

The Gerstein court concluded that warrantless arrest require the determination of probable cause to be made "by a judicial officer promptly after arrest." – Gerstein id. at 125. A perfunctory release and immediate re-arrest would violated the 36-hour rule. Cf. State v. Kasper 411 N.W.2d 182, 184-85 (Minn. 1987) (holding that speedy trial "clock" was not restarted when the State dismissed and refiled the complaint.) The State's (complaint) against Markham must be dismissed with prejudice because of the State's failure to afford Petitioner a speedy trial.

Petitioner argues, out of all documents, this motion was the only copy that was not filed after the judge or the district attorney sign off on it. The "Motion to Extend 36 hour rule," was not authenticate with an accurate date or time-stamped. This motion was file after O.H dropped charges January 22, 2016, the night of the incident and after Dakota County dropped charges January 25, 2016. Petitioner was protected by the Brady Rule when Petitioner's trial lawyer Catherine Turner, filed a motion on the defendant behalf, "Request for disclosure," Time-stamped February 10, 2016 at 3:43:07 pm, in Dakota County, MN. "To turn over any document prosecutor intend to use."

2

However, after Assistance County Attorney Jennifer S. Bovitz filed a motion to request an, Extended 36 hour, without an authenticated time-stamped copy, Markham argue he does not know what time exactly his motion was filed, to hold him without probable cause attorney Jennifer hand typed a "Statement of probable cause, acting as a witness and electronically signed on it first at 01:10, 1-25-2016 and sent a copy to Police Chief Micheal A. Aschenbrener who electronically signed at 01:20, 1-25-2016, 1-25-2016, after Assist. Attorney Jennifer Bovitz signed, verifying she approved to prosecute the offense charged before the complainant Micheal A. Aschenbrener typed and signed his copy of "Statement of probable cause. The judicial officer Micheal J. Mayer the same judge who signed Attorney Jennifer S. Bovitz, motion to, "Extend 36 hour rule," without a authenticated time-stamped copy. Judge Micheal J. Mayer electronically signed; 1-25-2016, 02:48 pm and did not filed the complaint until 1-25-2016, 02:58 p.m., in Dakota County after the 1:30 pm deadline Attorney Jennifer S. Bovitz requested for.

Howere, Assistant County Attorney Jennifer S. Bovitz, was acting as a complaining witness rather than a prosecuting Attorney when she executed the "Probable Cause" certification "under penalty of perjury." Since the Fourth Amendment requirement that arrest warrants be based "upon probable cause, supported by Oath or affirmation" may not be satisfied by the mere filing of unsworn information signed by the prosecutor. See Gerstein v. Pugh, 420 U.S. 103, 117, 43 L.Ed 2d. 54, 95 S. Ct. 854, and since most Minnesota prosecutions are commenced by information State Law requires that an arrest warrant be supported by either an affidavit "or sworn-testimony establishing the grounds for issuing the warrant."

3

Testifying about facts in the **function** of the witness, not of the prosecution. No matter how brief or **succinct** it may be, the **evidentiary** component of **an application for** an arrest warrant is **a** distinct and **essential** predicate **for** finding of probable. Even when the person who makes the constitutionally required "Oath or **affirmation**" is a prosecutor, the only function that she performs is that of a witness.

SEE Exhibit 9-11, 12, 13, 14 And 15

K. Defendant Prosecutor **Dain** Olson, reside or works at Dakota County Judicial Center, and is employed as a Prosecutor in the Dakota County Judicial Center. This defendant is sued in **his:** Individual and Official capacity.

   The charges against Markham were built on the hazy and shifting stories of Harris and Davis. The complaint based on one of those stories, put Markham on notice that he was charged with one count of first-degree burglary (assault-harm), but he was acquitted of that charge. He was convicted of first-degree burglary (assault-fear) following two substantial errors:

   First, the trial court allowed the State to **amend** the complaint to add the assault-fear count in violation of Markham's Fifth, Sixth and **Fourth Amendment** rights to the notice, nature and cause of the accusations or charges, despite the fact that it was a new and different offense and **the State** had **rested**.

   Second, the prosecutor mistated the law in closing argument, suggesting the jury could convict Markham of the assault-fear count based merely upon intentional acts, rather than a specific intent to cause fear. The erroneous argument likely led the jury to find Markham guilty despite Harris's hazy **recollection** and in the absence of sufficient evidence. Moreover, following trial, Markham recieved only the transcripts of Harris's 911 **calls** from the state. Harris's story in the call differed from her statement to police, and both differed from her trial testimony. **If** Markham had the 911 recording prior to trial, he could have used the call to further damage Harris's credibility. Had it heard evidence of the 911 call, the jury, which **clear**ly questioned the State's evidence, likely would have acquitted him of both charges.

2,

The Court of Appeals concedes that the 911 call had impeachment value, but determind the Brady violation was immaterial because Harris's credibility had already been attacked.

The Court of Appeals failed to give petitioner the benefit of harmless beyond a reasonable doubt standard. The Court failed to looked primarily to the weight of the State's case, and to specifically address the possible outcome if the Brady material would have reached its full damaging potential. See Martham, No. A16-1548 and Exhibit 3-5

1. Defendant Detective Ryan Olson, resides or works at Dakota County Judicial Center, and is employed as a "electronic-crime-task-force officer in the Dakota County Judicial Center. This defendant is sued in his: Individual and Official capacity.

Here, as in Markham defense, the admission of Detective Ryan Olson testimony about O.H's statement was hearsay. O.H did not testify and O.H statement was not given under oath or subject to cross-examination by defense Counsel. (See Honorable Richelle Wahi, Transcripts of Proceedings on March 22, 2016; (Tr. 7). Second, there was a real dispute over whether I was that O.H and the defendant on the jail recorded phone call audio] or what [the statement] Contained. Third, O.H's statement was irrelevant to the other evidence introduced by the State. (Vol. 1; Tr. 6-11),

Here, the only evidence offered by the state at trial to prove that defendant alleged "Fear" in O.H, indicating that Markham was "Controlling and a Bully" was detective Ryan Olson testimony to Exhibit 12. Here, doing the defendant's examination, the state told the court "'Sheriff's department confirms the telephone conversation was made by the defendant before the prosecutor could cross-examine Ryan Olson.(Tr. 250-251). Here, Ryan Olson stated," He knew who the male voice was. Tr. 281 (1.14-18). But, right before that Ryan Olson stated," He never met the defendant. Tr. 263 (L.11-16). Here, the state has not shown good cause for playing exhibit 12 after the witness was excuse from the courtroom. Tr. 251-252.

Here, in closing arguments the state has misled the jury by saying, "The defendant in the call is repeatedly asking her to change her story, and he gives her different alternatives for what to change it to." Here, defendant never took the stand and there wasn't nobody in court to cross-examine when the court allow the state to play a jail recorded (DANCO) phone call

after defense attorney objected to playing Exhibit 12, in front of a jury (Tr. 6-11).

Here, again the state misled the jury as if defendant was controlling and bully, by stating "lets look at her conduct after the fact. What about that phone call? Did it seem like an involuntary conversation with the defendant? She said after the fact she put money in his account. Its consistent with the physical evidence. Its consistent with the defendant's statement and him trying to get her to change her story repeatedly. The officer testified, large number of call repeatedly trying to get her to change her story (Tr. 326). Here, Court acknowledges the state admitting the jail recorded (DANCO) phone call was incriminating to defendant's case. (Tr. 257-258). The mere asking of an improper jail (DANCO) recorded call may be sufficient to communicate to the jury the very information the rules of evidence were designed to keep out. Such an unwarranted comment improperly injected the prosecutor's personal belief as appellant's guilt. Moreover, the jail (DANCO) recorded call comment was clearly designed to influence and inflame the passion of the jury. Generally, these errors must be prejudicial. The jail (DANCO) together, constitute plain error. See Exhibit 12, 6, and 7

M. Defendant Defense Counsel Catherine Turner, resides or works at Dakota County Judicial Center, and is employed as a "Public Defender in the Dakota County Judicial Center. This defendant is sued in her: Individual and Official capacity.

Markham's trial counsel knew, First, that she was ineffective in not attempting to contact O.H, Tracy Ogunyemi and S.D nor interview the Police officers who arrested Markham inside his Brooklyn Park resident which would have enable Markham's counsel to introduce into evidence the significant discrepancies between O.H's account of the crime and her three sign written prior inconsistent statements to investigator.

Second, Markham contends that had his defense counsel done so, the reliability of the jail recorded phone call that Detective Ryan Olson testify to was hearsay or the Brooklyn Park Police Department who made the warrantless arrest on behalf of Dakota County would have been undermined.

Petitioner's claim of failure to properly investigate and interview all known witnesses, failure to call certain witnesses ... are all interrelated.

Neither counsel nor Dakota County [Public Defender] investigator interviewed officer [Tolbert], the arresting officer, S.D, O.H, Markham's landlord [Diana Kaldun], Markham's roommate [Tracy Ogunyemi] and the Dakota County Detective [Ryan Olson] before trial. Defense counsel did not even attempt to interview the witnesses herself.

Here, defense counsel made at least some attempt to contact the alibi witnesses whose name Markham had provide to counsel before pretrial:

Defense counsel had a public defender investigator call and interview [Tracy Ogunyemi] over a phone and O.H came in and sat down with defense investigator after she gave several sign statements recanting her story about the event the night of January 22, 2016. Yet, when the Dakota County

investigator took a statement from [Tracy Ogunyemi] who stated she seen Markham home between 12:30 am and 1:00 am. Here, the state did not call [Tracy Ogunyemi] as a witness at Markham's trial. Indeed,... instead of calling [Tracy Ogunyemi], the state called Detective [Ryan Olson], that works in the Dakota County Sheriffs office/Investigator Electronic Crime Task Force. See Vol. 3, Tr. 279. Defense Counsel's investigation was far "less than complete." See Strickland, 466 U.S. at 691. Defense Counsel never personally attempted to contact any of the potential alibi witnesses, and, after the investigator ——— learned from [Tracy Ogunyemi] stating Markham was at his 8164 Brandywine Parkway resident between 12:30 am and 1:00 am. See Prose direct appeal addendum.

Defense counsel did not even attempt to interview [Tracy Ogunyemi] herself. Yet, defense counsel did not present an alibi defense at trial.

Petitioner maintains that counsel's failure to locate and interview potential witnesses was IAC. Defense Counsel was aware, that there were 5 witnesses plus detective [Ryan Olson], with no apparent reason to help the defendant, who made statements to the Dakota County public defender investigator that were exculpatory or inconsistent with the prosecution witnesses' statements. The names and addresses of these witnesses were available to defense counsel; yet, her attempts to locate and interview them were perfunctory at best, including her decision not to put on any witnesses in support of viable theory of defense fall outside the wide range of professionally competent assistance.

Here, trial counsel failed adequately investigate the facts and law as they related to petitioner's defense that if the court compare O.H's testimony at trial, three sign written prior inconsistent statements to investigator and the undisclosed 911 call, the record shows O.H's "undisclosed statements

directly contradicted [O.H's] testimony," on critical elements of the prosecutor case: identification of who assaulted O.H, whether it was O.H's "ex-boyfriend," and on the essential element of "body harm, physical pain and injury" required for a successful conviction. Over defense objection, the court allowed the state to introduce a portion of a call Markham made to Harris from jail on January 22, 2016, during which Markham suggested Harris say her "boyfriend was not at the house that night," she was crying because they had argued that day, and that she broke her door because she was drunk and locked out. See Ex. 12, jail recorded Transcripts.

Had Markham and his defense counsel known about the 911 call withheld evidence, they could have challenged the state case by raising an alternative theory, namely, that O.H's "ex-boyfriend" was liable for the assault, injury and crime.

Markham points this court to the 911 transcript. The 911 transcripts or Brady material clearly shows O.H's statement to the 911 operator that her "ex-boyfriend" not "boyfriend" was liable for the alleged offense. It is clear from both the trial and the 911 records that O.H had both a "boyfriend" and an "ex-boyfriend." This contradictory evidence that conflicts with O.H's trial testimony reasonably shows that at the time of the alleged incident, an alternative perpetrator [O.H's "ex-boyfriend"] existed.

The trial record shows that the State's purpose of introducing the jail call recording as argued by the prosecution in (Vol. 1, Tr. 10 at 1-8-12) ("in light of the fact that they have a domestic relationship, these phone calls also give insight into the relationship between the parties and between Ms. Harris and defendant, and, therefore, would also be admissible as relationship evidence under Minn. Stat. 634.20") was to show the relationship between Markham and O.H.

The trial record also shows that the state's purpose of introducing the jail recording as argued by the state in (Tr. 250-254, 254)(L16-12) was because the evidence is "inculpatory in nature because they show a conscious effort on the part of the defendant." Markham argues that the state admitted "unduly prejudicial" jail call recording that was coerced or involuntary inculpatory in native, and relationship evidence against his interest at trial.

Markham also argues that the state allowed the jury to re-listen to this jail call recording twice at trial. Trial counsel objected in (Tr. 254-256-262) to the admission of the recording at trial, arguing in relevant part that the admission of this evidence against Markham's interest "is inflammatory, it's prejudicial, it's irrelevant and it's cumulate" and renders Markham's trial fundamentally unfair "to confuse and prejudice and inflame the jury about Markham in an unlawful way." SEE Exhibit 3-5, 6 and 7-8

N. Defendant Appellate Counsel Sara L. Martin (No. 287064), resides or works at Assistant State Public Defender, Office of the Minnesota Appellate Defender and is employed as a "Public Defender assistant." This defendant is sued in her ~~Individual and Official capacity~~.

Appellate Counsel provided constitutionally ineffective of Appellate Counsel by refusing to refine Markham's claims, that he raised in his pro se direct appeal.

Markham provided constitutionally ineffective assistance of Appellate Counsel by refusing to raise the Court's plain error, of entering an order of conviction without subject-matter-jurisdiction in Markham's direct appeal.

5

Appellant receive ineffective Appellate counsel for failing to raise a probable-cause-to-arrest and ineffective-assistance-of-trial-Counsel for "failure to object" claim, related to the prosecution failing to give copies of the alleged Brooklyn Park Police "Original reports" transcripts the court received as exhibit 1, a compact disc containing copies of the police reports. See Judge Wahi [Finding of Fact]. *Exhibit 18, 19*.

0. Defendant Judge Richelle M. Wahi, resides or works at Dakota County Judicial Center and is employed as a Judge in the Dakota County Judicial Center. This defendant is sued in her: **Individual** and Official capacity.

The State committed a constitutional error when they violated Petitioners due-process by withholding the Brooklyn Park Police "original report," is a Brady violation.

Petitioner argues the Minnesota Court of Appeals contradicted themselves when they stated in their decision filed July 22, 2019. "There is nothing supporting or substantiating Markham's assertion that this disc did not contain the "arresting officer's report." *see Exhibit 18, 19*

1. Petitioner argues in Judge Wahi, pretrial order "Findings of Facts," she clearly stated district court received Exhibit 1, including a disc contains police reports.

2. Judge Wahi, did not state in her "Findings of Fact," those "police reports" in exhibit 1, contain police reports of Brooklyn Park Police Department and Mendota Heights Police Department.

3. Judge Wahi, clearly stated in her "Findings of Facts," that exhibit 1, was Officer Hilyar "incident reports" of Mendota Heights Police Department.

4. This contradict what the prosecutor stated in his CA18-1831)
respondent brief pg. 3 and 9.
   A. District court received into evidence copies of the police
      reports, including the reports from Brooklyn Park, as exhibit 1.

   B. The record clearly shows those reports were submitted
      to the district court at the "Contested Omnibus hearing."

5. Judge Wahl, confirm it in her "Findings of Fact," it was in fact
only (Officer Hilyar) reports in exhibit 1, by labeling it
Officer's Hilyar "Incident report" as exhibit 1. See Judge Wahl
Findings of Fact.

P. Defendant Judge David L. Knutson, resides or works at
Dakota County Judicial Center and is employed as a Judge
in the Dakota County Judicial Center. This defendant is
sued in his: Individual and Official capacity.
   Petitioner argues the Court's deliberate indifference violation
of other constitutional right was "evil intent" by Judge David L.
Knutson denying Petitioner a new trial for the newly discovered
evidence such as the Brooklyn Park arresting officer's
original police reports, missing stamped 911 transcript and
data, Brooklyn Park "original police reports," with recorded
testimony from the Petitioner's landlord [ Diana Katdum ]
which prosecutor withheld evidence during trial is a
Brady violation that substantiates Markham claim there
was neither a warrant, nor a warrantless exception to
authorize the arrest in Markham's Brooklyn Park resident
(Hennepin County) by Dakota County.
SEE Exhibit 1-2, 3-5

Q Defendant Oxana Harris, resides at 567 Hawatha Ave,
Mendota, Heights, MN 55118. This defendant is sued in her
Individual and Official capacity.

Mendota Height Police Officer Stephen Hilyar responded to
a call involving domestic dispute around 3:00 a.m. on
January 22, 2016. (Tr. 210, 216). He was met by Oxana Harris,
who lived in the home, and a black male. (T 211). Hilyar thought
Harris had been crying because her mascara was running.
(T 211-212). Hilyar could smell alcohol on her breath. (T 211-212).
In her call to 911, Harris claimed she had been hit in the
mouth and her mouth was bleeding. See 911 audio Trans.
• "The 911 call was not disclosed prior to trial despite
   several requests. Petitioner raised this issue in a motion
   for new trial, and attached a copy of the transcripts to
   one of his post-trial motion."

By contrast, Harris told Hilyar she had been hit and had
a bloody nose. (T 224). Hilyar did not see any blood on Harris'
face or nostrills, however. (T 224). And, while Harris also
claimed that she had been pushed to the ground, there were
no visible marks on her body. (T 212, 224).
The black male at Harris's home provided several false
name, but Hilyar eventually identified him as Shawn Davis.
(T 212, 223). Hilyar was "baffled" about why Davis gave a
false name, though he did not arrest Davis for providing
false information to a police officer. (T 219, 223). Davis
refuse to allow Hilyar to photograph a scratch on his cheek.
(T 218-219, 228). Like Harris, Davis had been drinking (T 224).

Hilyar was at Harris's home for about three hours. (T 232).
During that time, Harris received several calls and text
messages, which Harris claimed were from Markham. (T 214).
Hilyar did not document those calls or message, however.
(T 223). And, he did not note the time stamp on the text

messages. (T229). At one point, Hilyar spoke to the caller and told him to stop calling. (T214).

Hilyar attempted to take statements from Harris and Davis, though he did not separate them. (T226). Davis interrupted Harris several times. (T226-227). Hilyar said to Davis, "I don't have a reason to believe what you're saying because you lied to me about your name." (T220). Harris told Davis to leave. (T227). Hilyar did not conduct a PBT or field sobriety tests before Davis drove away. (T228, 232-233, 235).

Hilyar did not believe Harris or Davis was intoxicated when he responded to the call during the early morning hours of January 22nd. (T233). Harris's and Davis's trial testimony, however, revealed that both were intoxicated and had hazy recollections of the incident.

Harris testified as follows: She dated Markham for about six months prior to January 22nd. (T172-173). Harris claimed Markham had been disrespecting her and talking about sharing intimate photos. (T202).

Harris and Davis had been drinking vodka and socializing for a couple hours before Markham arrived. (T174, 197). She did not remember how much she drank, but she was "very intoxicated." (T174).

Harris initially testified that she was in her bedroom at the back of the house when Markham arrived, pounded on the front door, and shouted. (T174). She later stated that she was at the front door with Davis when Markham arrived. (T175). She claimed Markham walked around the outside of her house and knocked on her bedroom window. (T175-176).

Harris was in her room when she heard a noise, which she thinks was the door being broken, and then more shouting from inside the house. (T176-177, 198). Harris was so intoxicated that she could not remember what Markham was doing or what he was shouting. (T175-176).

7.

Harris remembered running to the car, slipping on ice, and ending up in the snow. (T177, 180, 183). She saw Markham as she ran past him. (T179). Her tire was flat, and she could not drive away. (T179). She went back inside and did not see Markham again. (T180). Harris called 911. (T179).

Harris claimed that she continued to receive calls and messages from Markham after he left. (T181). She said that Markham threatened to show friends her "personal pictures" if she went to count. (T182). The following day, Markham and a "hired hand" came to her house to fix the door and change her tire. (T185).

Harris did not recall what she told the responding officer. (T183-185). She was very intoxicated and did not remember the entire incident. (T185). She also made clear that she did not see who broke her door, damaged items in her home, or flattened her tire. (T185, 204). Later, when she was sober, she told the officer that she would like to drop the charges. (T185, 200-201). She was feeling upset and disappointed in Markham when she was drunk and made the allegations. (T201, 203, 208).

Moreover, following trial, Markham received only the transcripts of Harris's 911 calls from the state. Harris's story in the call differed from her statement to police, and both differed from her trial testimony. If Markham had the 911 recording prior to trial, he could have used the call to further damage Harris's credibility. Had it heard evidence of the 911 call, the jury, which clearly questioned the state's evidence, likely would have acquitted him of both charges.
SEE Exhibit 1-2, 6, 7, 18-19

R. Defendant Diana Kaldun, resides at 8164 Brandywine Parkway, Brooklyn Park, MN and is a landlord at 8164 Brandywine Parkway, Brooklyn, MN. This defendant is sued in her: Individual and Official capacity. Defendant Diana Kaldun, violated tenants rights when she allow Brooklyn Park Police Officer in the home without a warrant. "The record shows that "police officers" went to Markham's residence, where he rented a room and the homeowner invited them inside." Petitioner was a tenant; he had possession at the 8164 Brandywine Parkway residence. see Minn. Stat. § 504 B. 211 subd. (2)(3) Dotson, 900 N.W. 2d 445 (2017), and post-conviction Brief. *SEE Exhibit 1-2*

S. Defendant Brooklyn Park Police Department, resides or works at Brooklyn Park Police Department, and is employed at Brooklyn Park Police Department. This defendant is sued in his/her Individual and Official capacity. Defendant Brooklyn Park Police Department, violated the warrantless entry of the Brooklyn Park home at 8164 Brandywine Parkway to seize Markham was a violation of his Fourth Amendment rights. Standing did exist; there wasn't any exigent circumstance to justify the warrantless entry of the Brooklyn Park home. The two main issue on post-conviction concern the legality of Markham's arrest. Was there probable cause? Did circumstance justify a warrantless, nonconsensual entry of the home? Petitioner argue both these questions must be answer no, and, therefore, evidence obtained from his arrest mostly important, 911 transcripts and data, the Brooklyn Park arresting officer's original reports, Brooklyn Park "Original police report," with recorded testimony from petitioner's landlord Diana Kaldum and victims' statement to the police, should have been suppressed because of the withheld evidence because of the Brady violations.

T. Defendant Mendota Heights Police Department, resides at or works at Mendota Heights Police Department, and is employed at Mendota Heights Police Department. This defendant is sued in his/her: Individual and Official capacity.

Defendant Officer Steve Hilyar, violated by authorizing Brooklyn Park Police Department to make a warrantless entry of the Brooklyn Park home at 8164 Brandywine Parkway to seize Markham was a violation of his Fourth Amendment rights. Standing did exist; there wasn't any exigent circumstance to justify the warrantless entry of the Brooklyn Park home. SEE Exhibit 1-2, And 14

u. Defendant Dakota County Judicial Center, resides at 1560 Highway 55, Hasting, Mn. 55033 and employed as a Police Officer. This defendant is sued his/her: Individual and Official capacity.

Assistant County Attorney Jennifer S. Bovitz, was acting as a complaining witness rather than a prosecuting Attorney when she executed the "Probable Cause" Certification "under penalty of perjury." Since the Fourth Amendment requirement that arrest warrants be based "upon probable cause, supported by oath or affirmation" may not be satisfied by the mere filing of unsworn information signed by the prosecutor. See Gerstein v. Pugh, 420 U.S. 103, 117, 43 L. Ed.2d. 54, 95 S. Ct. 854, and since most Minnesota prosecutions are commenced by information state Law requires that an arrest warrant be supported by either an affidavit "or sworn-testimony establishing the grounds for issuing the warrant."

Testifying about facts in the function of the witness, not of the prosecution. No matter how brief or succinct it may be, the evidentiary component of an application for an arrest

31 of 37

warrant is a distinct and essential predicate for finding
of probable. Even when the person who makes the
Constitutionally required "oath or affirmation" is a
prosecutor, the only function that she performs is that
Of a witness.
SEE Exhibit 1-2, and 14

**Attach additional sheets of paper as necessary.**

**Check here if additional sheets of paper are attached:** ☐

**Please label the attached sheets of paper to as Additional Facts and continue to letter the paragraphs consecutively.**

V. REQUEST FOR RELIEF   see Attach pgs. 34-37

State briefly exactly what you want the Court to do for you.  Do not make any legal arguments or cite any cases or statutes.

Markham is seeking "Money Damages", under "Nominal Damages," for violating Markham rights. Markham also seeking "Compensatory Damages", from suffering an physical injury. The Official who are responsible should pay Markham for Medical and other expenses, for any wages Markham lost for the value of any part of Markham body or physical functioning which cannot be replaced or restored, and for Markham "pain and Suffering", warrantless arrest, wrongful Conviction, False Imprisonment."

Markham is seeking $60 Million

I (We) hereby certify under penalty of perjury that the above complaint is true to the best of my (our) information, knowledge, and belief.

Signed this  19th  day of January , 2022

Signature(s) of Plaintiff(s)    _Oji Markham_
                              MCF - Faribault
                              1101 Linden Lane
                              Faribault, MN 55021

Note:   All plaintiffs named in the caption of the complaint must date and sign the complaint and provide his/her mailing address and telephone number. Attach additional sheets of paper as necessary.

## V.    Request For Relief

First, I want to be exonerated from all charges. Second, Prosecutor Jennifer S. Bovitz, Prosecutor Dain Olson, and Prosecutor Heather D. Pipenhagen should be forced to resign after repeated misconduct - including withholding exculpatory evidence and lying to a judge - should result in a reversal of the multiple constitutional violations.

Third, Markham is seeking "Money Damages," under "Nominal Damages," for violating Markham rights. Markham also seeking "Compensatory Damages," from suffering an physical injury. The officials who are responsible should pay Markham for Medical and other expenses, for any wages Markham lost, for the value of any part of Markham body or physical functioning which cannot be replaced or restored, and for Markham "pain and suffering."

Markham also is seeking "Monetary Compensation," and "Punitive Damages" because the defendants' actions were "Motivated by evil motive and intent," also defendants' actions involved "Reckless and Callous Indifference to Markham rights."

Markham has been victimized by prosecutors who overcharge, withhold key evidence, and engage in a myriad of other forms of professional misconduct." When Markham later seek redress in his Habeas Corpus, they encounter denial, resistance, and delays. The prosecutor's role in our adversarial justice system to obtain convictions, regardless of a defendant's guilt or innocence, necessarily creates competitiveness in terms of winning cases. But as stated by the U.S. Supreme Court, "[W]hile he may strike hard blows, he is not at liberty to strike foul ones.

It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."
Berger v. United States, 295 U.S. 78 (1935).

According to the Innocence Project and Center for Prosecutor Integrity, the "foul blows" that prosecutors may strike can assume many forms, including:

1. Charging a suspect with more offenses than warranted
2. Making race-based jury selection decisions in violation of Batson v. Kentucky
3. Withholding or delaying the release of exculpatory evidence
4. Deliberately mishandling, destroying, or "losing" evidence
5. Allowing witnesses they know or should know are not truthful to testify
6. Pressuring or threatening defense witnesses to testify for the prosecution
7. Relying on fraudulent forensic experts
8. During plea negotiations, overstating the strength of the evidence
9. Making statements that are designed to arouse public indignation
10. Making improper or misleading statements to the jury or court
11. Failing to report misconduct by other prosecutors

Beyond the more typical examples cited above, sometimes prosecutors simply break the law themselves, using their position of authority to further their own personal interests.

In Brady, the U.S. Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused upon request violate due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution."

There are three Component of a Brady violation:

(1) the withheld evidence must be favorable to the defendant because it is exculpatory or can be used for impeachment purpose; (2) the evidence must have been suppressed by the prosecution, either willfully or unintentionally; and (3) prejudice to the defendant must have resulted.

Even when a defendant fails to properly request favorable evidence, the government is still liable for failure to disclosed certain information. Constitutional error results if favorable evidence is withheld, and "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

Although Markham found "the evidence establishs that this misconduct was intentional," it also was legally insufficient to support a conviction under the federal criminal Comtempt Statue, 18 U.S.C. § 401.

Prosecutorial misconduct occurs for a variety of reasons, but with respect to Brady violations, an inadequate oversight system to detect, review, and sanction such abuses may encourage some prosecutors to take their changes by withholding evidence. Further, although Brady and its progeny decisions have routinely bemoaned the unfairness that results when prosecutors deprive a defendant of favorable evidence, post-trial appellate reviews of such violations focus on the effect the evidence might have had on the verdict, requiring the defendant to demonstrate a "reasonable probability" of a different outcome had the evidence been disclosed - a fairly subjective standard.

As stated by the U.S. Supreme Court, the "materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Strickler v. Greene, 527 U.S. 263 (1999) (prosecution's failure to produce notes of conflicting statements made by eyewitness deemed insufficient to constitute Brady violation in death penalty case) (Citations omitted).

With our results-oriented judiciary, the higher the stakes the smaller the likelihood of reversal for Brady violations.

As such, from an adversarial point of view, the temptation for prosecutors to withhold evidence can be an obvious one, as the worst-case scenario is usually a retrial and not dismissal of the charges, and sanctions are unlikely. Simply put, the manner of review of Brady violations carries little disincentive for a prosecutor who puts winning a conviction above their ethical obligation to seek justice.

"There is an epidemic of Brady violations abroad in the land," former Chief Judge Alex Kozinski of the U.S. Court of Appeals for the Ninth Circuit wrote in a dissenting opinion in December 2013. "Only judges can put a stop to it," he added. United States v. Olsen, 737 F.3d 625 (9th Cir. 2013).